AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Montana

United States of America
v.
Richard Marion Blosser

Defendant(s)

Case No. MJ-26-80-BU-KLD

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November of 2023 to October of 2026 in the county of Gallatin in the District of Montana, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud (Penalty: 20 years imprisonment, $250,000 fine, and three years of supervised release) |
| 18 U.S.C. § 1957 | Money laundering (Penalty: 10 years imprisonment, $250,000 fine, and three years of supervised release) |
| 18 U.S.C. § 152(2), (3), (6), (9) | Concealment of assets; false oaths and claims; bribery: 5 years imprisonment, $250,000 fine, and three years of supervised release) |

This criminal complaint is based on these facts:

See attached affidavit, incorporated herein by reference

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Brian Anderson, Special Agent IRS-CI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 10/23/2026

/S/ Kathleen L. DeSoto
*Judge's signature*

City and state: Missoula, Montana

Hon. Kathleen L. DeSoto, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>Richard Marion Blosser,<br><br>Defendant. | CRIMINAL COMPLAINT<br><br>MJ-26-80-BU-KLD<br><br>WIRE FRAUD<br>Title 18 U.S.C. § 1343<br>(Penalty: 20 years of imprisonment, $250,000 fine, and three years of supervised release)<br><br>MONEY LAUNDERING<br>Title 18 U.S.C. § 1957<br>(Penalty: 10 years of imprisonment, $250,000 fine, and three years of supervised release)<br><br>CONCEALMENT OF ASSETS; FALSE OATHS AND CLAIMS; BRIBERY<br>Title 18 U.S.C. § 152 (2), (3), (6), (9)<br>(Penalty: 5 years of imprisonment, $250,000 fine, and three years of supervised release) |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A COMPLAINT

I, Brian Anderson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a complaint.

2. I am a Special Agent with the U.S. Department of Treasury, IRS Criminal Investigation (hereinafter "IRS-CI") and have been since employed as such since September of 2009. I am currently assigned to the Phoenix Field Office, Montana District office. My duties and responsibilities include the investigation of potential criminal violations of Internal Revenue laws (Title 26, United States Code), Bank Secrecy Act laws (Title 31, United States Code), Money Laundering Control Act laws (Title 18, United States Code, §§ 1956 and 1957), and related offenses.

3. I hold a Certified Public Accountant (Inactive) license from the State of Colorado. My education includes a Master's Degree in taxation from the University of Denver and a Bachelor's Degree in accounting from the University of Northern Colorado.

4. As a Special Agent, I have received training in various aspects of criminal investigations dealing with criminal law, criminal tax law, money laundering, search, seizure, forfeiture, and various financial investigative techniques. I have attended continuing educational classes and seminars in various aspects of criminal investigation, dealing specifically with asset seizure and forfeiture, financial investigative techniques, and international financial fraud. My experience includes investigations of individuals, partnerships, and corporations. Many of these

investigations involved illegal activities, such as mail or wire fraud, investment schemes, embezzlement, theft, currency reporting violations, narcotics trafficking, money laundering, and tax evasion.

5. I have been involved in the execution of numerous federal search warrants, which resulted in the seizure of hard copy and electronic evidence, including financial records, tax returns, bank records, accounting records, correspondence, and other documentation related to criminal activity.

6. I have been involved in the execution of numerous federal seizure warrants, which resulted in the seizure of assets, including cash, vehicles, jewelry, and real property purchased with money traceable to proceeds of fraud and narcotic-related crimes.

7. The facts in this affidavit come from my investigation, personal observations, my training and experience, and information obtained from other law enforcement officers, witnesses, and informants. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

8. As detailed more completely below, there is probable cause to believe the following crimes have been committed: Wire Fraud, in violation of 18 U.S.C. § 1343; Money Laundering, in violation of 18 U.S.C. § 1957; Oaths or Accounts in

Bankruptcy/Concealment/ Destruction/Withholding of Documents or Property, in violation of 18 U.S.C. § 152 (2), (3), (6) & (9).

**PROBABLE CAUSE**

9. Richard Marion Blosser ("BLOSSER") is a registered financial adviser and the sole member of Pathfinder Wealth Advisors LLC ("Pathfinder"). BLOSSER and his wife, Pamela, are both members of Sanctuary Partners LLC ("Sanctuary Partners"). In 2022, the Financial Industry Regulatory Authority ("FINRA") barred BLOSSER from acting as an adviser. BLOSSER filed a voluntary Chapter 11 bankruptcy in the District of Montana on September 18, 2025 (*In re Richard M. Blosser*, 2:25-bk-20172-BPH), which was dismissed shortly thereafter. On March 27, 2026, BLOSSER filed a second voluntary bankruptcy (*In re Richard M. Blosser*, 2:26-bk-20082-BPH), which was converted to Chapter 7 on May 12, 2026. Darcy Crum was appointed as Chapter 7 Trustee.

10. Based on records and witness statements entered into the record during bankruptcy proceedings, in addition to statements made by BLOSSER under oath during bankruptcy proceedings, numerous issues came to light that appeared to be criminal in nature.

11. On August 3, 2026, the Office of the United States Trustee, District of Montana, referred BLOSSER to the District of Montana United States Attorney's

Office for "conduct related to what appears to be a Ponzi scheme," with estimated losses of at least $5,000,000.00.

12. Based on the referral, IRS-CI and the Federal Bureau of Investigation initiated criminal investigations. With the assistance of the United States Trustee, numerous victims were identified with losses totaling over $20,000,000.00. Below is a sampling of victims and loss amounts to overview BLOSSER's conduct.

**INVESTMENT FRAUD**

13. Evidence indicates BLOSSER solicited and received investor funds which he diverted to personal and real property expenses rather than investing as represented. Below are examples of victims and loss amounts to give an overview of BLOSSER'S conduct.

i. **GW** (whose identity is known to law enforcement but protected here)

1. During bankruptcy proceedings, BLOSSER admitted GW was a long-time wealth management client through Pathfinder. Blosser also admitted he was the trustee for her estate, meaning he had control of GW's bank and investment accounts, to include the assets of the GW Living Trust.
2. GW died on April 28, 2024.
3. During bankruptcy proceedings, BLOSSER testified the Trust was closed and that its assets had been distributed to the

beneficiaries. BLOSSER also admitted he, Pathfinder, and Sanctuary Partners were not beneficiaries of the Trust.

4. Per the GW Trust documents, the beneficiary that was to receive the bulk of the Trust proceeds was Shriners Hospitals for Children. At a later bankruptcy hearing, BLOSSER admitted no funds had gone to Shriners.

5. A Pathfinder "Asset-Map" for GW dated April 2024 was obtained by the Trustee's Office. That asset-map showed GW's assets included the following:

| | | |
|---|---|---|
| a. | Trust Account | $5,757,245 |
| b. | IRA | $ 236,292 |
| c. | Residence | $1,370,000 |
| | TOTAL: | $7,363,637 |

6. The investigation shows the Trust has been nearly completely depleted, with most of those funds being diverted to BLOSSER for his personal benefit.

7. After GW's death, BLOSSER obtained a loan on GW's home. The proceeds of that loan were used for BLOSSER's benefit.

8. During bankruptcy proceedings, BLOSSER admitted he eventually sold GW's home in January of 2025. The home was

sold for $1,378,000.00. The proceeds from the home sale, after paying off the outstanding loan, were obtained by Blosser.

9. GW was the Trustee for her trust's investment account at Charles Schwab (x3833) for many years. BLOSSER, through Pathfinder, was the wealth manager. A review of statements from 2020 through late 2023 shows a fluctuating investment account balance between $5,000,000 to $6,600,000. Beginning in November 2023, significant withdrawals were initiated that can be traced to BLOSSER's personal benefit as follows:

   a. On November 29, 2023, $200,000 was wired from GW's trust account (x3833) to an account at Relay Bank (x7347) in the name of Pathfinder, where BLOSSER was the sole signer. On November 30, 2023, BLOSSER sent $80,000 from that Relay Bank account to his personal account at Bank of America ("BOA") (x4095). That money is traceable to various companies and individuals that appear to have nothing to do with investments, including a $5,000 payment to Nordstrom Card Services, and a $66,000 payment to a mortgage servicer for his personal residence.

b. In December 2023, $2,295,000 was withdrawn from GW's trust account (x3833) and sent to an account at Relay Bank (x7347) in the name of Pathfinder, where BLOSSER was the sole signer. (Note: $1,930,000 of the $2,295,000 was first sent to x7347, then almost immediately back to another account at Relay Bank (x4878) in the name of GW's trust, before $915,000 was eventually sent back to the x7347 account). That money is traceable to various companies and individuals that appear to have nothing to do with investments, including $912,000 in wires to BLOSSER's personal BOA account (x4095); $24,000 to "Black Bull Golf"; $62,513.39 to "YELLOWSTONECLUBO ACH Pull"; $14,420.00 to "Queen of Diamonds Visa"; $18,000 to Nordstrom; $500,000 to a white-shoe law firm; and various large payments to other individuals who have been identified as likely investor clients of BLOSSER.

c. In January, 2024, $880,000 of funds continued to be transferred from the Relay Bank (x4878) in the name of GW's trust to either an account at Relay Bank (x7347) in

the name of Pathfinder, where BLOSSER was the sole signer, or BLOSSER's personal account at BOA (x4095). That money is traceable to various companies and individuals that appear to have nothing to do with investments, including $12,630.78 to Nordstrom N Visa, another $500,000 to the same white-show law firm, $103,906.25 to a loan service provider for his personal residence, $313,064.00 to individuals identified as likely investor clients of BLOSSER, $9,000 is Zelle payments to BLOSSER's wife and daughter, among various others.

d. By the end of January 2024, just $2,567,254.65 of securities were left in GW's trust account (x3833) and were transferred to another custodian. At this point, the exact disposition of those securities is unknown.

e. Eventually, on June 14, 2024, several months after GW's death, a new account was opened at Schwab (x5042) under the name of GW's trust with BLOSSER as the trustee. An initial deposit of $1,241,736.85 was made on June 20, 2024. Additionally, on July 15, 2025, a deposit of $689,420.00 was received into the Schwab account

(x5042). This deposit represented proceeds from a loan obtained by BLOSSER on GW's residence (which he controlled as the Trustee). Between June 21, 2024, and the end of August, 2024, $1,452,200 had been withdrawn and sent to Relay Bank (x2130) in the name of Sanctuary, where BLOSSER was the sole signer. Some additional smaller amounts were sent to Relay Bank account (x7347) and others. By August 2024, a little over $20,000 remained in the Schwab account (x5042). The money removed in June through August of 2024 is traceable to various companies and individuals that appear to have nothing to do with investments. Well over $1,000,000 was transferred to BLOSSER's personal account at BOA (x4095). Large expenditures during this time frame in the personal account at BOA (x4095) include over $1,000,000 to a mortgage servicer lender for residential real estate connected to BLOSSER, $207,812.50 to a mortgage servicer lender for BLOSSER's personal residence, $50,027.24 related to the Wynn Las Vegas, $15,850.00 at Chanel, among

others. Further, withdrawals from the Sanctuary Schwab account (x2130) include things such as $50,000 to "'YELLOWSTONECLUBO ACH Pull" and $2,082.03 to "'WINRED* TIM SHEEHY VISA."

10. As previously mentioned, after GW's death, BLOSSER obtained a loan on GW's home, the proceeds of which were used for BLOSSER's benefit. Eventually, on July 24, 2025, that property was sold for $1,378,000.00. Part of the sales proceeds, $768,307,25 were used to pay off the loan BLOSSER obtained ($750,000 principal amount plus interest and fees). After accounting for other sales expenses, the remaining proceeds of $527,989.08 were transferred to a GW trust account at BOA (x3477) on January 24, 2025. The account was depleted between January 2025 and April 2026. Most funds were transferred to BOA bank accounts for Sanctuary Partners (x4025), Pathfinder (x1439), and BLOSSER's personal account (x4095). One example of the use of these funds is on January 28, 2025, where $80,000 was wired from GW's trust account at BOA (x3477) to Sanctuary Partners (x4025). On the very same

day, $76,562.50 was wired from Sanctuary Partners (x4025) to a mortgage servicer for BLOSSER's personal residence.

ii. **DT & LT** (whose identities are known to law enforcement but protected here)

1. On December 15, 16 and 17, 2025, investors LT and DT wired a total of $750,000.00 to Sanctuary Partners. On December 15, 2025, BLOSSER transferred $50,000.00 to Pathfinder's BOA account (x1439). That same day, BLOSSER immediately wired those funds, in two wires of $25,000 each, to different clients of Pathfinder. BLOSSER also immediately began transferring funds from Sanctuary Partners' account to his personal BOA account (x4095). From December 15, 2025, through December 31, 2025, BLOSSER transferred $366,900.00 from Sanctuary Partners' account to his personal account. He also wired substantial funds to other individuals, made payments on short-term loans, and paid $20,331.94 to the mortgage holder on his Bozeman residence. Funds in BLOSSER's personal account were used for various payments including luxury retail purchases: $2,067.00 at Channel #22, $1,020.00 at Gucci, and $7,000.00 at Nieman Marcus.

2. There is no evidence BLOSSER invested or otherwise utilized any of LT & DT's funds in the manner they had intended when entrusting BLOSSER with the funds.
3. In April of 2026, after threatened legal action when their money was not returned as promised, BLOSSER wired LT and DT $700,000.00. Bank records show the money returned to LT and DT was sourced from a different victim.
4. Although they received their money back, LT and DT have been notified that the $700,000.00 must be returned as it is property of the bankruptcy estate, which will create a $700,000.00 loss for them.

iii. **GH & AH** (whose identities are known to law enforcement but protected here)

1. GH & AH have been friends with the BLOSSERs for around twenty years. Around September of 2025, Blosser approached GH & AH with an investment opportunity purportedly for friends and family, advising the investment would return around 12% in three weeks. After agreeing to invest, in September of 2025, GH & AH sent three wires totaling $60,000.00 to Sanctuary Partners. After the initial investment,

BLOSSER requested additional investment money from GH & AH. GH & AH's two children, approximately 11 and 14 years old, had received an inheritance that was to be used for their college education. GH & AH invested $73,000.00 of the inheritance money with BLOSSER for each of the children. On December 4, 2025, an additional two wires for $73,000.00 each were sent to Sanctuary Partners.

2. To date, Blosser has not repaid GH & AH, although he has made numerous promises to do so.
3. BLOSSER sent GH & AH fraudulent Pathfinder Statements dated December 31, 2025, for GH & AH and each child showing their original investment amount and a current capital account value showing significant returns. Further, more recently, BLOSSER sent GH & AH fraudulent Pathfinder Statements dated May 31, 2026, for GH & AH and each child showing their original investment amount and a current capital account value showing significant returns. Bank record analysis shows BLOSSER never invested the funds from GH & AH.
4. A review of the flow of funds in September of 2025 for GH & AH, revealed the following:

a. On September 24, 2025, GH & AH wired $55,000 in two separate wires to Blosser's Sanctuary Partners account (x4025). Additionally, on September 29, 2025, GH & AH wired $5,000 to Blosser's Sanctuary Partners account (x4025). On September 25, 2025, Blosser sent $5,937.40 to various companies and individuals that appear to have nothing to do with investments, including $1,000 to his wife ("Mommy Blosser"). From September 26, 2025 to September 29, 2025, Blosser sent $38,992.59 to various companies and individuals that appear to have nothing to do with investments, including a wire on September 26, 2025, for $20,000 to a mortgage servicer for his personal residence, Zelle payment to Blosser's daughter and son-in-law, and a transfer of $9,400 to another victim's account.

5. A review of the flow of funds in December of 2025 for GH & AH children's college savings accounts, revealed the following:

a. On December 4, 2025, GH & AH wired $146,000 in two separate wires to Blosser's Sanctuary Partners account (x4025). From December 5, 2025, to December 15,

2025, Blosser sent $176,181.24 to various companies and individuals that appear to have nothing to do with investments, including $13,410 to NAV Kapital, LLC (an online direct, cash advance lender), $62,800.00 to his personal checking account at BOA (x4095), $57,750 to another BOA account in the name of Pathfinder (x1439), $8,500 to Mommy Blosser, $7,500 to Doheny Capital,[1] and $17,186.82 to the Ritz Carlton in Naples, FL.

iv. **SF & LF** (whose identities are known to law enforcement but protected here)

1. In 2025, BLOSSER approached friends SF & LF about an investment opportunity. BLOSSER said the investment had to do with a risk-free hedge fund that would return 20%. After agreeing to invest, on April 4, 2025, SF & LF wired $80,000.00 to the Pathfinder bank account.
2. SF & LF have repeatedly requested their money back from BLOSSER. BLOSSER has continually promised to return the money but has not done so.

[1] At a hearing in the US Bankruptcy Court, Missoula, MT on October 13, 2026, Blosser testified that Doheny Capital was a lender broker for a refinancing deal he was working on for his personal residence.

3. SF & LF were in dire straits. With SF in the middle of maternity leave and LF in the middle of stage 4 cancer treatments, they urgently needed to be repaid as evidenced by a text message sent to BLOSSER in July 2026, that read:

Good Morning! I hope you had a bomb day yesterday! I just wanted to touch base, rick I don't think you know how badly I really need this money to come in by Wednesday this week. We're supposed to sign our new rental lease on Thursday and if I don't have rent money in the account by Wednesday, our Landlord's not gonna let us renew our lease and we will literally be kicked out. I also have to pay daycare for this month. If I don't get that paid [C.F.] gonna get kicked out of daycare & [H.F] won't even be able to start in July (which I really need so I can be at work full-time again). We are down to milk, eggs, half a block of cheese, and condiments in our fridge... our freezer is down to 2 pounds of hamburger and two chicken breasts and some chili from Texas Roadhouse... yesterday I went to make toast for myself for breakfast and realized it was the last two pieces of bread and had to put the bread back in the bag so I could make [C.F.] a sandwich for lunch. it's really bad and I've been trying to make everything stretch, but I have nothing left to stretch financially. I even started selling stuff on Facebook marketplace this weekend. I have to be able to have rent money on Wednesday. The first time I was told the money is gonna hit was eight weeks ago. :/ I'm just at a point where I don't know what to do and there's really nothing I can do. Is there a problem with the zelle info? Is this going to be in by bank account in the next couple days? I'm in full panic mode at this point, I just didn't want to bug you over Father's Day weekend, but I'm at the end of my rope.

4. BLOSSER sent SF a fraudulent Pathfinder statement dated August 31, 2026, showing the value of the initial investment

had increased substantially. Bank record analysis has shown the funds from SF & LF were never invested by BLOSSER.

5. A review of the flow of funds in April of 2025 for SF & LF:, revealed the following:

   a. On April 21, 2025, SF & LF wired $80,000 to Blosser's Pathfinder account (x1439). The next day, on April 23, 2024, Blosser wired $78,000 (in two wires) to Blosser's Sanctuary Partners account (x4025). After that, between April 23, 2025, and May 9, 2025, Blosser wired $72,400 to his personal checking account at BOA (x4095) and $1,000 to his wife, among other transactions.

v. **MB & PB** (whose identities are known to law enforcement but protected here)

1. In May of 2026, BLOSSER approached friends MB & PB about an investment opportunity. Blosser explained the investment and stated they could earn 20% in about one week. After agreeing to invest, on May 5, 2026, MB & PB sent two wires totaling $80,000.00 to the Sanctuary Partners bank account. The money was requested and sent after BLOSSER

had filed for bankruptcy, and BLOSSER did not inform MB & PB of the active bankruptcy.

2. When the money was not returned after a week, BLOSSER provided excuses and said the money was coming. One such excuse was that BLOSSER was trying to make it "tax-free" and additional time was needed to complete that objective. MB has stayed in constant communication with BLOSSER about the investment, but BLOSSER has not returned the money.

3. BLOSSER sent MB & PB a fraudulent Pathfinder statement dated August 31, 2026, showing the value of the initial investment had increased substantially. Bank record analysis has shown BLOSSER never invested the funds from MB & PB.

4. On May 6, 2026, MB & PB wired $80,000 in two separate wires to Blosser's Sanctuary Partners account (x4025). On May 8, 2026, BLOSSER wired $1,682,843 to a mortgage servicer for his personal residence. The large payment to the mortgage servicer was sourced with $1,600,000 from another victim, Big Sky Strategic Holdings, that is discussed below.

vi. **JF** (whose identity is known to law enforcement but protected here)

1. On May 15, 2025, investor JF wired $150,000 to Sanctuary Partners (x4025); the following day, two payments totaling $103,906.25 were applied to the mortgage on BLOSSER's Yellowstone Club residence, and within a week, $46,500 was transferred to BLOSSER's personal BOA account (x4095).
2. In an email to JF, BLOSSER described the nature of the purported investment as follows: "Here is the overview of the trade. It's debt in Ambac which I am sure you have heard of. A hedge fund came to us to place a piece of 5mm+ they had to get rid of and we agreed to take it at a 25% discount. We already placed the sell side of the trade so it's done for 25% plus profit. It will be about a week to 10 day turn around. Completely derisked trade."
3. There is no evidence BLOSSER invested or otherwise utilized any of JF's funds in the manner JF had intended when entrusting BLOSSER with the funds.

vii. **JB** (whose identity is known to law enforcement but protected here)

1. In July of 2026, BLOSSER approached his friend JB about an investment opportunity. In a text message to JB, BLOSSER explained the investment as follows: "Here is the overview of

the trade. It's debt in Ambac which I am sure you have heard of. A hedge fund came to us to place a piece of 5mm+ they had to get rid of and we agreed to take it at a 25% -30% discount. We already placed the sell side of the trade so it's done for 25% plus profit. It will be an about a 3 day turn around. Completely 'derisked' trade."

2. JB agreed to invest and on July 2, 2026, he wired $10,000.00 to BLOSSER's personal account at Bank of America. This investment was made after BLOSSER had filed for bankruptcy BLOSSER did not advise JB of the active bankruptcy.
3. After three days passed, BLOSSER did not return the money as promised. JB stayed in communication with BLOSSER about the money, and BLOSSER provided multiple excuses about why the money had not been returned. To date, JB has not received any money back from BLOSSER.
4. On July 2, 2026, JB wired $10,000 to Blosser's personal checking account (x4095). From July 3, 2026, to July 13, 206, Blosser sent $9,045.09 to various companies and individuals that do not appear to have anything to do with investments, including, $1,499.02 to a doggy daycare company, various

small expenditures for Apple.com, Conoco, Disney Plus, Atwell Suites (hotel), Doordash, Netflix, Montana Spirits & Wine, and $319.92 for "jwsbill.com."[2]

viii. **BB** (whose identity is known to law enforcement but protected here)

1. In July 2026, BLOSSER called a very, very close family member to solicit investment in a hedge fund. BB, who has experienced some cognitive decline since surgery for brain cancer (January 2025), accepted the offer and sent $25,000 on June 2, 2026, to Pathfinder BOA account x1439. BB called BLOSSER to ask for her $25,000 back, threatening to report what he did to her bank. BB said BLOSSER chuckled as he explained that her money was invested in a hedge fund that could not be liquidated until a later date. A review of the bank statements for BOA account x1439 shows the $25,000 coming in on June 2, 2026, and on June 3, 2026, BLOSSER sent $15,000 to another investment client. Additionally, on June 4 and June 5, 2025, BLOSSER sent a total of $10,000 to his personal account at BOA (x4095).

---

[2] At a hearing in the US Bankruptcy Court, Missoula, MT on October 13, 2026, Blosser testified that "jwsbill.com" was a pornography website.

## LOAN FRAUD

14. Part of BLOSSER's scheme entailed obtaining loans from various sources using fraudulent documents and misstatements regarding his true financial condition. Below are examples of loan loss victims:

**ix. Arixa Institutional Lending Partners 2A, LLC**

1. On July 30, 2025, the BLOSSERS, through Sanctuary Partners, entered into a $2,213,000.00 loan agreement with Arixa to purchase a personal residence located in Bozeman, Montana. A balloon payment of $2,232,363.75 was due on August 1, 2026.
2. As part of the loan process, Blosser provided several documents that have been determined to be fraudulent.
    a. BLOSSER provided a fraudulent Letter of Explanation stating he had settled the liens against him filed by Wells Fargo (approximately $10 million) and UBS (approximately $3 million). In reality, the debts had not been paid and were still outstanding.
    b. BLOSSER provided a fraudulent Personal Financial Statement dated January 2025, showing the following:
        i. Assets totaling $45,285,773

ii. Cash on Hand of $452,000 – Financial record analysis has shown BLOSSER did not have this amount of cash on hand.

iii. Stocks and Bonds of $5,356,773 – During the August 14, 2026, bankruptcy hearing, BLOSSER admitted he did not have that amount in stock.

iv. Real Estate of $28,800,000 – During the August 14, 2026, bankruptcy hearing, BLOSSER admitted he did not own the home at 2229 Howard Avenue, San Carlos, CA. On the statement, BLOSSER indicated it was an investment property with no mortgage balance. BLOSSER admitted it was actually owned by the Florence Collins Trust of which his wife was a beneficiary with her brother.

v. Other Assets of $7,780,000 – Financial record analysis has shown BLOSSER did not have other assets totaling that amount.

vi. Liabilities totaling $30,857,431 - BLOSSER failed to disclose that he owed over $10 million to Wells Fargo and nearly $3 million to UBS. In fact, he

provided a letter saying those debts had been resolved, when they were not.

c. BLOSSER provided a fraudulent Pathfinder statement from Axos Advisor Services for Sanctuary Partners dated June 30, 2025, showing an account value of over $5 million. During the August 14, 2026, bankruptcy hearing, BLOSSER admitted he did not have an account with Axos during that time period, did not have the assets listed in the statement, Sanctuary did not own any stock, and Sanctuary did not have an account with Pathfinder. Further, BLOSSER admitted Pathfinder did not have a relationship with Axos in June of 2025.

3. To date, the loan has not been repaid. Arixa filed a Proof of Claim indicating BLOSSER owes them $2,231,818.30.

**x. Big Sky Strategic Holdings, LLC**

1. Blosser obtained two loans from Big Sky Strategic Holdings totaling $3,410,000.00. The first loan of $1,750,000.00, obtained in November of 2025, was obtained to pay off a lien holder on BLOSSER's Yellowstone Club residence. The second loan of $1,660,000.00, obtained in April of 2026, was

obtained to ward off the first lien holder from foreclosing on the Yellowstone Club property.

2. To procure the loans, BLOSSER provided several documents that have been determined to be fraudulent, which were relied upon when making lending decisions.

    a. BLOSSER provided a fraudulent appraisal for the Yellowstone Club property. An appraisal of the property was prepared by Bridger Appraisals, Inc. dated December 5, 2023. Per Bridger Appraisals, the opinion of value on the genuine appraisal was $20,000,000.00. BLOSSER provided Big Sky Strategic Holdings with an appraisal from Bridger Appraisals dated December 5, 2023 showing a value of $25,000,000.00.

    b. Blosser provided a fraudulent Personal Financial Statement dated August 2025 showing the following:

        i. Assets totaling $47,809,000.00

            1. IRA/Retirement Accounts of $880,000.00 – During his bankruptcy hearing on August 14, 2026, BLOSSER admitted he did not

have $880,000.00 in IRAs or other retirement accounts.

2. $12,870,000 in Other Assets – During his bankruptcy hearing on August 14, 2026, Blosser stated that amount was ascribed to Pathfinder. BLOSSER stated Sanctuary Partners did not have any investment accounts and that Sanctuary Partners never had an account at Pathfinder. The financial analysis conducted during the investigation has not shown Pathfinder/Blosser to have any investment funds.
3. Real Estate Owned – BLOSSER listed the present market value for his Bozeman residence as $4,250,000.00. BLOSSER purchased the residence two months prior for $2,950,000.00.
4. BLOSSER failed to disclose the outstanding Wells Fargo and UBS liens against him totaling approximately $13,000,000.00.

ii. Fraudulent Pathfinder 2024, 2025, & 2026 YTD Profit and Loss Statements – BLOSSER provided a Profit and Loss Statement showing Pathfinder had 2024 Net Earnings of $2,426,854.00, 2025 Net Earnings of $3,121,506.00, and 2026 Year to Date Net Earnings of $753,442.00. The financial investigation has not shown any evidence to support these figures.

**xi. LD3 Management LLC, Et al.**

1. On September 10, 2025, BLOSSER executed an agreement for a $350,000.00 loan with a group of five lenders, each contributing $50,000.00 or $100,000.00. BLOSSER advised he needed a short-term bridge loan for his Yellowstone Club property. BLOSSER advised he was refinancing the property and the deal was set to close in two weeks. BLOSSER stated the $350,000.00 loan would be repaid after closing. To date, the loan has not been repaid.
2. As part of due diligence, BLOSSER provided several documents to the group that have been determined to be

fraudulent. The group relied on the information provided by Blosser when making their lending decision.

a. BLOSSER provided the fraudulent appraisal for the Yellowstone Club property described above. It valued the property at $25,000,000.00 rather than at the $20,000,000.00 value determined by the genuine appraisal.

b. BLOSSER provided a copy of the first page of a 2024 1040 (U.S. Individual Income Tax Return) for Richard and Pamela BLOSSER. The 1040 included an amount for Adjusted Gross Income of $3,059,861, and an amount for Taxable Income of $2,858,433. In bankruptcy proceedings, BLOSSER admitted he had not filed an income tax return for the year 2024. Further, based on the financial investigation, there is no evidence to support that amount of income for the BLOSSERs in 2024.

c. Fraudulent Pathfinder 2024 & 2025 YTD Profit and Loss Statement – BLOSSER provided a Profit and Loss Statement showing Pathfinder had 2024 Net Earnings of $3,281,359, and 2025 Net Year to Date Net Earnings of

$3,582,156. The financial investigation has not shown any evidence to support these figures. Also, the figures do not align with the Profit and Loss Statement provided to Big Sky Strategic Holdings.

**BANKRUPTCY FRAUD**

15. On March 27, 2026, BLOSSER filed his original "Form 101 – Voluntary Petition for Individual Filing for Bankruptcy." This form was signed by BLOSSER under penalties of perjury with a jurat that reads, "I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571." Within this form, specifically on page 7, BLOSSER indicated his estimated assets were worth "$0-$50,000" and indicated his estimated liabilities to be "$0-$50,000." The representation by BLOSSER about his assets and liabilities was false for many reasons. Specific examples include:

i. BLOSSER failed to account for vast amounts of jewelry which have since been identified by, and in some cases turned over to, the Chapter 7 Trustee. In an undated Thorson Insurance Services "Personal Articles Schedule" for "Mr. Richard Blosser," there is a listing of

jewelry valued at $1,454,152.00, which includes various "Rolex .... Mens Watch" items valued in excess of $50,000.

ii. BLOSSER failed to include a civil judgment against him personally, in favor of Wells Fargo Clearing Services, dated March 2, 2023, in the amount of $10,349,489.20, in Case No. 22VECP00010[3] (Los Angeles Superior Court, Cal.); and,

iii. BLOSSER failed to include a judgment against him personally, in favor of UBS Financial Services Inc., dated March 9, 2022, in the amount of $2,980,782.23, in Case No. 22STCP00836[4] (Los Angeles Superior Court, Cal.)

iv. In testimony before the bankruptcy court on April 24, 2026, BLOSSER was asked about the asset amount representations and whether they were accurate; he replied "No, that's not accurate. And the liabilities isn't accurate, so that's incorrect, what is checked." When asked about the representations about his liability amounts, he said "Yeah, that's not correct, either. And that's -- you know, that was

---

[3] This judgement was later filed through an Entry of Foreign Judgement in Montana through Cause No DV-29-2025-30 (Montana Fifth Judicial District Court, Madison County) dated March 20, 2025.

[4] This judgement was later made public in Montana through an Entry of Foreign Judgement through Cause No DV-29-2025-30 (Montana Fifth Judicial District Court, Madison County) dated March 20, 2025.

-- that was inc- -- that was a mistake on my part. I didn't -- wasn't -- you know?"

v. As previously stated, BLOSSER concealed these liabilities from Arixa Institutional Lending Partners 2A, LLC and Big Sky Strategic Holdings, LLC when applying for mortgage funding. BLOSSER even sent Arixa Institutional Lending Partners 2A, LLC a letter saying he had settled the liens.

vi. On May 8, 2026, BLOSSER filed a Form 106Sum, signed under penalty of perjury, that failed to identify any jewelry assets. This Form 106Sum did disclose the outstanding judgements with respect to Wells Fargo Clearing Services and UBS Financial Services Inc.

vii. On August 21, 2026, BLOSSER filed a "Debtor's Itemized List and Declaration Pursuant to August 17, 2026 Order." Within this declaration, after previously representing assets and liabilities under $50,000, BLOSSER reported large dollar jewelry transactions, large liabilities well in excess of $50,000, showing BLOSSER as the borrower, various leased automobiles, and art, furniture, handbags, and jewelry valued at $2,470,00. This document was signed under penalty of perjury and dated August 20, 2026.

viii. As of October 13, 2026, BLOSSER's liabilities known to the bankruptcy court total approximately $60,000,000.

16. As recently as two weeks ago, BLOSSER told victim SF that she should abstain from filing as a creditor in BLOSSER's bankruptcy case. He said she did not want to file because she would get pennies on the dollar and reiterated her investment was safe. He told her that he is "private about reports" he files in the bankruptcy and that he was "trying to be strategic." SF inferred that BLOSSER's comments meant, if she did not file as a creditor, BLOSSER was going to find a way to pay her back outside of the oversight of bankruptcy process.

17. During bankruptcy proceedings, and specifically during trustee examinations, the court made multiple direct findings that BLOSSER was not truthful, not credible, and gave false representations. For example, in one such order,[5] the court wrote the following:

a. "Blosser's representations to lenders are inconsistent and inaccurate."

b. "Blosser's testimony and exhibits presented by the Trustee establish that Sanctuary misrepresented its June 2025 account statements, showing that it possessed $5 million in assets it

---

[5] *See In re Crum*, 2:26-bk-20082-BPH (Doc. 191).

never held. Similarly, in May 2026, Blosser generated an account statement with a Pathfinder logo for the JHW 2025 Irrevocable Family Trust. According to that statement, the Trust had total assets under management in excess of $12 million. The account statement was not true. There were no funds in a custodial account for the Trust in May 2026."

c. "The testimony of SW, JF, and JB was not only credible, it was compelling… Conversely, Blosser's testimony was incredible at times, often indicating he did not recall when responding to a question."

d. "There remain significant gaps in Blosser's testimony, causing the Court to question his credibility."

## USE OF WIRES

18. The review of multiple interviews of victims and a review of bankruptcy transcripts shows BLOSSER used phone calls, text messages and email to perpetrate his fraud. These communications allowed him to induce investments from victims, provide lulling excuses, create and send fraudulent documents, and finally, allow him to receive and send fraudulent proceeds through the United States financial banking system. Your affiant knows, from training and experience, many of these phone calls, text messages, emails, and banking

transactions required a transmission by interstate wire to function and execute. For example, financial institutions operating within the United States utilize interstate wire communications, including online banking networks, electronic funds transfer systems, ACH networks, and wire transfer systems, to process, clear, and settle financial transactions. All of these wires were used, in part, for the purpose of executing and furthering BLOSSER's fraud.

## CONCLUSION

19. Based on the above, there is probable cause to believe BLOSSER committed Wire Fraud, in violation of 18 U.S.C. § 1343, Money Laundering, in violation of 18 U.S.C. § 1957, Oaths or Accounts in Bankruptcy/Concealment/ Destruction/Withholding of Documents or Property, in violation of 18 U.S.C. § 152 (2), (3), (6) & (9).

Brian Anderson
Special Agent
IRS Criminal Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 23rd day of October, 2026.

/S/ Kathleen L. DeSoto
Kathleen L. DeSoto
United States Magistrate Judge